T.C. Memo. 2014-31

UNITED STATES TAX COURT

K.H. COMPANY, LLC EMPLOYEE STOCK OWNERSHIP PLAN, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 15819-12R.                    Filed February 24, 2014.

Carol Tomb (a member), for petitioner.

<u>John Q. Walsh, Jr.</u>, and <u>Michael C. Dancz</u>, for respondent.

MEMORANDUM OPINION

KERRIGAN, <u>Judge</u>:  In this declaratory judgment proceeding under section
7476 petitioner challenges respondent's March 20, 2012, final revocation letter
determining that for its plan years ending September 30, 1995, and its subsequent
plan years, the K.H. Co., LLC Employee Stock Ownership Plan (plan) was not

[*2] qualified under section 401(a) and that the related trust is not exempt under section 501(a).

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the period under consideration, and all Rule references are to the Tax Court Rules of Practice and Procedure.

The broad question we consider is whether there was an abuse of discretion in respondent's determination. To decide that question, we consider (1) whether the plan met certain statutory requirements and/or whether the terms of the plan were amended timely or properly; (2) whether a qualified appraiser was used for required valuations; and (3) whether the plan operated within its terms.

## Background

The parties submitted this case fully stipulated under Rule 122 on the basis of the pleadings and the administrative record in accordance with Rule 217(a). The underlying facts are derived from the administrative record, which the parties submitted fully stipulated.

K.H. Co., LLC (K.H. Co.), is an Iowa limited liability company (LLC). Its principal place of business was in Iowa at the time petitioner filed the petition. During the period under consideration K.H. Co. was the sponsor, employer, and

[*3] administrator of the plan. Before October 6, 1994, K.H. Co. operated as K.H. Co., Inc., an Iowa corporation with its principal place of business in Iowa.

K.H. Co., Inc., was the original sponsor, employer, and administrator of the plan. The plan's original effective date was September 30, 1988. On August 20, 1990, respondent issued K.H. Co., Inc., a favorable determination letter regarding the 1988 plan.

For plan years ending September 30, 1992 and 1993, contributions of $20,700 and $27,081, respectively, were made to the plan. No other contributions were made during the period under consideration.

On October 6, 1994, K.H. Co., Inc., began operating as K.H. Co. The members of K.H. Co. were Carol Tomb (also known as Carol Hoffman) and the K.H. Co. Inc. employee stock ownership trust. Immediately before the operating change Ms. Tomb was K.H. Co. Inc.'s registered agent and its only director. After the operating change Ms. Tomb served as K.H. Co.'s registered agent. During the period under consideration Ms. Tomb was the only employee of K.H. Co.

Also on October 6, 1994, K.H. Co. signed, but did not date, a plan document with a purported effective date of October 6, 1994. The document refers to the 1994 plan as an employee stock ownership plan (ESOP) and states that each plan year ends on September 30.

**[*4]**   On July 9, 1997, K.H. Co. amended the 1994 plan.  Ms. Tomb signed, but did not date, a second amendment to the 1994 plan with a purported effective date of August 5, 1997.

On October 1, 2001, K.H. Co. amended the 1994 plan a third time and created an amended and restated plan document effective October 1, 2001.  The document refers to the 2001 plan as an ESOP.

Ms. Tomb was the plan's only participant for plan years ending September 30, 2002 and 2003.  Ms. Tomb was also the plan trustee for plan years ending September 30, 2000 through 2003.  The record does not reflect who was the plan trustee or who participated in the plan for the rest of the period under consideration.

Plan Specifics

The 1994 plan document and its amendments and the 2001 plan document are all titled "K.H. Company, L.L.C. Employee Stock Ownership Plan", and they all state:  "This Plan is intended to be an Employee Stock Ownership Plan as defined in Internal Revenue Code, Section 4975(e)".  They also state that "the assets of the Plan shall be invested primarily in Qualified Employer Securities".

**[*5]**   With respect to elective deferrals, the 1994 plan document and its amendments state:

> No Participant shall be permitted to have Elective Deferrals made under this Plan, or any other qualified plan maintained by the Employer, during any calendar year, in excess of $7,000 multiplied by the Adjustment Factor as provided by the Secretary of the Treasury. Other dollar limitations may apply under section 402(g) of the Code to the extent that a Participant makes Elective Deferrals to arrangements other than qualified cash or deferred adjustments.

The 2001 plan document, however, states:

> No Participant shall be permitted to have Elective Deferrals made under this Plan, or any other qualified plan maintained by the Employer, during any calendar year, in excess of $7,000 for calendar year 2001 and shall be determined for future years in accordance with * * * [a table providing for $11,000 for calendar year 2002 and increasing $1,000 per calendar year thereafter until 2006].

The 1994 plan document and its amendments specify that accrued benefits must be distributed or installment payments must begin no later than April 1 of the calendar year following the calendar year in which the employee attains age 70½. The 2001 plan document specifies that the accrued benefits must be distributed or installment payments must begin not later than April 1 of the calendar year following the calendar year in which the employee attains age 70½ or in which the employee retires.

**[*6]** The 1994 plan document and its amendments do not include a primary direction or control test in the definition of a "leased employee". Likewise, the 2001 plan document does not include a primary direction or control test in the definition of a "leased employee".

Section 414(u) specifies that a qualified plan must include provisions concerning special rules for veterans' reemployment rights and for differential wage payments to members on active duty under the Uniformed Services Employment and Reemployment Rights Act of 1994, Pub. L. No. 103-353, 108 Stat. 3149. The 1994 plan document and its amendments do not include provisions addressing section 414(u); however, the 2001 plan document includes those provisions by reference.

The 1994 plan document defines "compensation" as:

Compensation paid by the Employer to the Participant during the taxable year ending with or within the Plan Year which is required to be reported as wages on the Participant's Form W-2 and shall include compensation which is not currently includible in the Participant's gross income by reason of the application of sections 125, 402(a)(8), 402(h)(1)(B), or 403(b) of the Code, but shall not exceed $200,000, * * * for any Plan Year * * * .

The 1994 plan document defines "participant's compensation" as "within the meaning of Section 415(c)(3) of the Code".

**[*7]** The first amendment to the 1994 plan, effective October 6, 1994, defines compensation as including "any elective deferral and any amount which is contributed or deferred by the Employer at the election of the Employee by reason of section 125 or 147".

The 2001 plan document defines "compensation" as:

All W-2 wages paid to the Participant by the employer for the Plan Year and all earned income paid to self-employed individuals who are considered to be employees under the provisions of the Internal Revenue Code section 401(c)(1). Compensation also includes any elective deferral and any amount which is contributed or deferred by the Employer under the provisions of sections 125 and 401(k). Total compensation does not include any amounts paid to a Participant in excess of $200,000 plus any future cost of living or inflation increases permitted by the Internal Revenue Service.

The 2001 plan document defines "participant's compensation" as "within the meaning of Section 415(c)(3) of the Code".

The 1994 plan document does not define "eligible rollover distribution". The first amendment to the 1994 plan document defines "eligible rollover distribution", but the definition does not exclude hardship distributions. The 2001 plan document excludes hardship distributions from the definition of an eligible rollover distribution.

**[*8]** Plan Appraisals

John L. Henss was chosen to appraise K.H. Co. The administrative record includes appraisals and appraisal summaries for only 2000, 2001, and 2002. Written on "JLH" letterhead, the cover letter of each appraisal states: "At your request, we have prepared an appraisal valuation of KH Company, L.L.C." The cover letters refer to the "appraised value of common stock of KH Company, L.L.C." The cover letters are all dated, but none of them are signed.

Mr. Henss' qualifications are not described in the appraisals. The appraisal summaries state merely: "The undersigned holds himself out to be an appraiser. The undersigned is an accountant who is familiar with the assets being appraised." Mr. Henss did not sign or date the appraisals or the appraisal summaries.

Proposed Disqualification and Final Revocation Letter

On July 15, 2004, the Internal Revenue Service (IRS) began an examination of the plan. On January 6, 2006, the IRS proposed to disqualify the plan for the following reasons: (1) the plan ceased to be a qualified ESOP when K.H. Co. became an LLC; (2) Mr. Henss was not a qualified independent appraiser for purposes of section 401(a)(28); (3) the plan failed to allocate employer securities to individual participants' accounts as specified in section 409(b) and therefore

**[*9]** failed to follow its own terms; and (4) the plan failed to amend timely with respect to certain statutory requirements.

On March 20, 2012, respondent issued a final revocation letter, determining that the plan failed to meet the requirements of section 401 for "the plan years ending September 30, 1995, and subsequent" and determining that the related trust was no longer exempt under section 501(a). Respondent determined that the plan contained disqualifying provisions because it failed to amend timely or properly the plan with respect to the following: (1) elective deferrals requirements under section 402(g)(5); (2) minimum distribution requirements under section 401(a)(9); (3) employee leasing under section 414(n); (4) special rules for veterans under section 414(u); (5) the definition of compensation under section 415(c); (6) early retirement benefit under section 401(a)(1); and (7) eligible rollover distributions under section 401(a)(14). Respondent also determined that Mr. Henss was not a qualified independent appraiser for purposes of section 401(a)(28)(C) and that the plan failed to allocate employer securities to individual participants' accounts.

## Discussion

In this declaratory judgment proceeding we review respondent's determination that the plan was not qualified.

[*10] Section 7476(a) authorizes this Court to make a declaration with respect to the initial or continuing qualification of certain retirement plans when the limitations of section 7476(b) are met. Neither party disputes that those limitations have been met in this case, and we are satisfied that we have jurisdiction over the petition. See generally Efco Tool Co. v. Commissioner, 81 T.C. 976 (1983) (discussing this Court's jurisdiction in the setting of a similar declaratory judgment case).

We set forth the standard for our review in Buzzetta Constr. Corp. v. Commissioner, 92 T.C. 641, 648 (1989), as follows:

> When reviewing discretionary administrative acts * * * this Court may not substitute its judgment for that of the Commissioner. The exercise of discretionary power will not be disturbed unless the Commissioner has abused his discretion, i.e., his determination is unreasonable, arbitrary, or capricious. Whether the Commissioner has abused his discretion is a question of fact, and petitioner's burden of proof of abuse of discretion is greater than that of the usual preponderance of the evidence. Estate of Gardner v. Commissioner, 82 T.C. 989, 1000 (1984); Oakton Distributors, Inc. v. Commissioner, 73 T.C. 182, 188 (1979).

See also Churchill, Ltd. Emp. Stock Ownership Plan & Trust v. Commissioner, T.C. Memo. 2012-300, at *6-*7.

Respondent determined that the plan and the related trust failed to qualify under sections 401(a) and 501(a), respectively, for the following reasons: (1) the

[*11] terms of the plan were not amended timely or properly to include certain provisions; (2) the plan failed to use an independent appraiser to appraise employer securities as specified in section 401(a)(28)(C); and (3) the plan, which purported to be an ESOP, failed to invest primarily in employer securities as specified in section 4975(e)(7).  A plan and a related trust may fail to qualify under sections 401(a) and 501(a) if any one of the above factors is missing.  See secs. 401(a), 4975(e)(7); see also Hollen v. Commissioner, T.C. Memo. 2011-2, slip op. at 8, 10 (holding that a plan that did not amend certain provisions timely failed to qualify under section 401(a) and holding that a plan that did not use an independent appraiser failed to qualify under section 401(a)), aff'd per curiam, 437 Fed. Appx. 525 (8th Cir. 2011).

Section 401(a) lists requirements which must be met in order for a trust to be considered a qualified trust entitled to preferential tax treatment under section 501(a).  See Hollen v. Commissioner, slip op. at 5.  In order for a plan to be qualified, both its terms and its operations must meet the statutory requirements.  Buzzetta Constr. Corp. v. Commissioner, 92 T.C. at 646; see also Churchill, Ltd. Emp. Stock Ownership Plan & Trust v. Commissioner, at *7.  We need not discuss specifically the qualification of the related trust under section 501(a) because the

[*12] exemption of the trust under section 501(a) follows from the qualification of the plan under section 401(a).  See Hollen v. Commissioner, slip op. at 6.

I.      Whether the Terms of the Plan Were Amended Timely or Properly

Respondent argues that petitioner failed to timely or properly amend the terms of the plan.  Petitioner contends that employee benefit rights were restored to appropriate levels under the statutes and the regulations.  To the extent that the terms of the plan were not amended timely, petitioner claims that the Commissioner normally allows retroactive amendments to comply with various statutory changes.  Respondent counters that, even if we were to consider the amendments petitioner made to be timely, the amendments did not comport adequately with the statutory changes and requirements.

During the 1990s and into the year 2000 various legislation affected existing employee benefit plans.  Those legislative enactments are sometimes known commonly and collectively as "GUST".[1]  Where the GUST legislative

---

[1]GUST is an acronym for the following legislation:  (1) the Uruguay Round Agreements Act (URAA), Pub. L. No. 103-465, 108 Stat. 4809 (1994), which implemented the Uruguay Round of the General Agreement on Tariffs and Trade; (2) the Uniformed Services Employment and Reemployment Rights Act of 1994, Pub. L. No. 103-353, 108 Stat. 3149; (3) the Small Business Job Protection Act of 1996, Pub. L. No. 104-188, 110 Stat. 1755; (4) the Taxpayer Relief Act of 1997 (TRA 97), Pub. L. No. 105-34, 111 Stat. 788; (5) the Internal Revenue Service Restructuring and Reform Act of 1998, Pub. L. No. 105-206, 112 Stat. 685; and

(continued...)

**[*13]** changes placed plans in a position of noncompliance, section 401(b) permits a remedial period within which to make plan amendments to comply with new legislation. The GUST remedial amendment period for the type of plan under consideration here ended on the later of February 28, 2002, or the last day of the first plan year beginning on or after January 1, 2001. See Rev. Proc. 2001-55, 2001-2 C.B. 552, modifying Rev. Proc. 2000-27, 2000-1 C. B. 1272.

If the employer files a request for a determination letter with respect to the qualification of the plan on or before the end of the remedial amendment period, the remedial amendment period is extended until 91 days after the date on which (1) the Commissioner issued the notice of the final determination with respect to that request, (2) the employer withdraws the request, (3) the Commissioner otherwise finally disposes of that request, or (4) if the employer files a timely declaratory judgment petition with respect to the Commissioner's final determination (or failure to make such a determination), a decision of this Court becomes final. See sec. 1.401(b)-1(e)(3), Income Tax Regs. Here, the last day of the first plan year beginning after January 1, 2001, was September 30, 2002. Although respondent received a submission for a favorable determination letter

---

[1](...continued)
(6) the Community Renewal Tax Relief Act of 2000, app. G of the Consolidated Appropriations Act, 2001, Pub. L. No. 106-554, 114 Stat. at 2763A-587 (2000).

**[\*14]** with a postmark date of January 9, 2003, the remedial amendment period had already expired on September 30, 2002.  Therefore, the deadline for the plan to adopt the various GUST requirements was September 30, 2002.

Respondent concedes that petitioner adopted a timely good-faith amendment for the required provisions in the Economic Growth and Tax Relief Reconciliation Act of 2001, Pub. L. No. 107-16, 115 Stat. 38.[2]  We address individually each aspect of the plan that respondent determined not to be in compliance.

A.    URAA Statutory Change That Affected the Plan

The Uruguay Round Agreements Act (URAA), Pub. L. No. 103-465, 108 Stat. 4809 (1994), implementing the Uruguay Round of the General Agreement on Tariffs and Trade, as pertinent to this case, changed plan requirements under section 402(g)(5).

Section 402(g) provides general limitations on the amounts of elective deferrals an individual may exclude from gross income.  For years beginning after December 31, 1994, URAA sec. 732(c), 108 Stat. at 5005, amended section 402(g)(5), which provided that elective deferrals be limited to $7,000, as adjusted

---

[2]Respondent also concedes that the terms of the plan were amended timely for "early retirement benefit" pursuant to sec. 401(a)(14).

**[\*15]** by the Secretary at the same time and in the same manner as under section 415(d), to require additionally that an increase not a multiple of $500 be rounded to the next lowest multiple of $500 ($500 adjustments).[3]  See also URAA sec. 732(e), 108 Stat. at 5005.

The 1994 plan amendments[4] failed to refer to the $500 adjustments or to state that the elective deferral limits would be adjusted under section 415(d).  The 2001 plan document likewise failed to refer to the $500 adjustments or to state that the elective deferral limits would be adjusted under section 415(d) for years beginning after December 31, 1994, and on or before December 31, 2001.

Petitioner nonetheless contends that the plan qualified under section 401(a) and that respondent has overlooked Rev. Rul. 82-66, 1982-1 C.B. 61, which allows a retroactive amendment to a qualifying retirement plan after the remedial period in certain circumstances.  Petitioner's contention misses the point that no

---

[3]The Economic Growth and Tax Relief Reconciliation Act of 2001 (EGTRRA), Pub. L. No. 107-16, sec. 611(d)(1) and (2), 115 Stat. at 97, later amended sec. 402(g)(5), effective for years beginning after December 31, 2001. See also EGTRRA sec. 611(i), 115 Stat. at 100.  Respondent concedes that URAA sec. 732(c) does not apply to plan years that began after December 31, 2001. URAA sec. 732(c) still applied to the 2001 plan document because its relevant plan year began on September 30, 2001.

[4]The 1994 plan document and the second amendment to the 1994 plan were not dated.  We will assume for sake of argument that they were valid.

[*16] correcting amendments addressing elective deferrals were made for the relevant plan years.

Accordingly, petitioner has not shown that respondent's reliance on this part of the determination as part of the basis for revocation was unreasonable or arbitrary. See Churchill, Ltd. Emp. Stock Ownership Plan & Trust v. Commissioner, at *10.

B.      SBJPA Statutory Changes That Affected the Plan

The Small Business Job Protection Act of 1996 (SBJPA), Pub. L. No. 104-188, 110 Stat. 1755, as pertinent to this case, changed plan requirements under (1) section 401(a)(9) concerning required minimum distributions; (2) section 414(n)(2)(C) concerning the definition of "employee leasing"; (3) section 414(u) concerning special rules for veterans; and (4) section 415(c)(3)(D) concerning a participant's compensation.[5]

1.      Required Minimum Distributions

Section 401(a)(9) provides for required minimum distributions and, additionally, that the entire interest of each employee must distributed not later

_____

[5]In respondent's opening brief respondent claims that the plan also failed to define properly "compensation" under sec. 414(q)(6) (concerning family aggregation rules in connection with "highly compensated employees"). This argument, however, is not in the final revocation letter, and respondent does not discuss it further on brief.

[*17] than the required beginning date or beginning not later than the required beginning date over the life of the employee or over the lives of the employee and the employee's designated beneficiary. See sec. 401(a)(9)(A)(i) and (ii). SBJPA sec. 1404(a), 110 Stat. at 1791, changed the required beginning date for participants other than a "5-percent owner" to April 1 of the year following the year in which the participant reaches age 70½ or, if later, following the year in which the employee retires. See sec. 401(a)(9)(C)(i) and (ii). This change was effective for years beginning after December 31, 1996. SBJPA sec. 1404(b), 110 Stat. at 1792; see also Churchill, Ltd. Emp. Stock Ownership Plan & Trust v. Commissioner, at *11. With respect to "5-percent owners" SBJPA sec. 1404(a) specified the beginning distribution date would be April 1 of the calendar year following the year in which the participant reaches age 70½.

The 1994 plan amendments and the 2001 plan document failed to distinguish between 5% owners and non-5% owners and therefore failed to specified properly the required distribution beginning dates. The 1994 plan amendments stated that, for all participants, accrued benefits be distributed or installments begin not later than April 1 following the calendar year in which the employee attains age 70½. The 1994 plan amendments thus failed to specify that benefits for non-5% employees would begin not later than April 1 following the

[*18] calendar year in which the employee attains age 70½ or the calendar year in which the employee retires.  The 2001 plan document, however, states that for all participants, accrued benefits be distributed or installments begin not later than April 1 of the calendar year following the calendar year in which the employee attains age 70½ or the calendar year in which the employee retires.  Thus, the 2001 plan document failed to specify that benefits for 5% owners would begin not later than April 1 of the calendar year following the calendar year in which the employee attains age 70½.

Petitioner did not make correcting amendments by September 30, 2002, the deadline to adopt the GUST amendments, or any other retroactive amendments as Rev. Rul. 82-66, supra, provides.

Accordingly, petitioner has not shown that respondent's reliance on this part of the determination as part of the basis supporting the determination for revocation was unreasonable or arbitrary.  See Churchill, Ltd. Emp. Stock Ownership Plan & Trust v. Commissioner, at *11-*13.

2.    Employee Leasing

Section 414(n) concerns circumstances where a "leased employee" performs services for another person (recipient) and may be treated as the recipient's employee for certain employee benefit provisions.  SBJPA sec. 1454(a), 110 Stat.

[*19] at 1817, amended section 414(n)(2)(C) with respect to the test to determine whether a "leased employee" would be considered the recipient's employee. This new test for whether a "leased employee" would be treated as recipient's employee (referred to as the "primary direction and control test") considered whether the "services are performed under the primary direction or control by the recipient." SBJPA sec. 1454(a). The primary direction and control test was effective for years beginning after December 31, 1996. Id. sec. 1454(b), 110 Stat. at 1817; see also Churchill, Ltd. Emp. Stock Ownership Plan & Trust v. Commissioner, at *19.

The 1994 plan amendments did not include the primary direction and control test. The 2001 plan document adds the primary direction and control test to the definition of "leased employee", but the 2001 plan document became effective on July 1, 2001, and did not apply to the years beginning after December 31, 1996, as specified in the SBJPA.

Accordingly, petitioner has not shown that respondent's reliance on this part of the determination as part of the basis for revocation was unreasonable or arbitrary. See Churchill, Ltd. Emp. Stock Ownership Plan & Trust v. Commissioner, at *9-*10.

**[\*20]**      3.      Special Rules for Veterans

SBJPA sec. 1704(n)(1), 110 Stat. at 1883, added section 414(u), which restores certain pension benefits, profit-sharing benefits, and similar benefits that would have accrued but for the employee's absence due to "qualified military service." These provisions were effective December 12, 1994. SBJPA sec. 1704(n)(3), 110 Stat. at 1886; see also Churchill, Ltd. Emp. Stock Ownership Plan & Trust v. Commissioner, at \*10-\*11.

The 1994 plan amendments did not incorporate the section 414(u) provisions. The 2001 plan document adds the section 414(u) provisions, but the 2001 plan document became effective on October 1, 2001, and not December 12, 1994, as specified in the SBJPA. Thus, petitioner failed to make the section 414(u) changes for plan years before October 1, 2001.

Accordingly, petitioner has not shown that respondent's reliance on this aspect of the determination as the basis for revocation was unreasonable or arbitrary. See Churchill, Ltd. Emp. Stock Ownership Plan & Trust v. Commissioner, at \*10-\*11.

      4.      Participant's Compensation

SBJPA sec. 1434(a), 110 Stat. at 1807, added section 415(c)(3)(D) concerning "participant's compensation". Section 415(c)(3)(D) was effective for

**[*21]** years beginning after December 31, 1997.  SBJPA sec. 1434(c), 110 Stat. at 1807; see also Churchill, Ltd. Emp. Stock Ownership Plan & Trust v. Commissioner, at *14.

Section 415(c) provides limitations for defined contribution plans.  Section 415(c)(1) currently provides:

> (1) In general.--Contributions and other additions with respect to a participant exceed the limitation of this section if, when expressed as an annual addition * * * to the participant's account, such annual addition is greater than the lesser of--
>
> (A) $40,000, or
>
> (B) 100 percent of the participant's compensation.[6]

Section 415(c)(3) defines the phrase "participant's compensation" generally as "the compensation of the participant from the employer for the year."  Section 415(c)(3)(D), as SBJPA sec. 1434(a) added it, further provides:

---

[6]URAA sec. 732(b)(2), 108 Stat. at 5005, amended sec. 415(c)(1)(A) by removing a reference to "1/4 of the dollar limitation in effect under subsection (b)(1)(A)".  URAA sec. 732(b)(2) was effective for years beginning after December 31, 1994.  URAA sec. 732(e), 108 Stat. at 5005.  Later, EGTRRA sec. 611(b), 115 Stat. at 97, amended sec. 415(c)(1)(A) by increasing the dollar limit from $30,000 to $40,000.  EGTRRA sec. 611(b) is effective for years beginning after December 31, 2001.  EGTRRA sec. 611(i), 115 Stat. at 100.

EGTRRA sec. 632(a)(1), 115 Stat. at 113, amended sec. 415(c)(1)(B) by increasing the percentage limit from 25% to 100%. EGTRRA sec. 632(a)(1)  is effective for years beginning after December 31, 2001.  EGTRAA sec. 632(a)(4), 115 Stat. at 115.

**[\*22]** (D) Certain deferrals included.--The term "participant's compensation" shall include--

(i) any elective deferral (as defined in section 402(g)(3)), and

(ii) any amount which is contributed or deferred by the employer at the election of the employee and which is not includible in the gross income of the employee by reason of section 125 or 457.

Thus, section 415(c)(3)(D) defines generally elective deferrals as those defined in section 402(g)(3) and any amount an employer deferred at the election of the employee that is not includible in gross income. <u>Churchill, Ltd. Emp. Stock Ownership Plan & Trust v. Commissioner</u>, at \*14.

Respondent contends that neither the 1994 plan amendments nor the 2001 plan document referred to any amounts which the employer contributed or deferred at the election of the employee and which are not includible in the gross income of the employee by reason of section 125 or 457. Respondent further contends that petitioner did not make the required amendments by September 30, 2002. Petitioner made no argument on brief concerning this issue.

The 1994 plan document defines "compensation" as:

Compensation paid by the Employer to the Participant during the taxable year ending with or within the Plan Year which is required to be reported as wages on the Participant's Form W-2 and shall include compensation which is not currently includible in the Participant's

**[*23]** gross income by reason of the application of sections 125, 402(a)(8), 402(h)(1)(B), or 403(b) of the Code, but shall not exceed $200,000 for any Plan Year * * * .

The first amendment to the 1994 plan amended the definition of compensation to include "any elective deferral and any amount which is contributed or deferred by the Employer at the election of the Employee by reason of section 125 or 147". The 2001 plan document, however, amends the definition of compensation to include "any elective deferral and any amount which is contributed or deferred by the Employer under the provisions of sections 125 and 401(k)."

The first amendment to the 1994 plan thus addressed some of the changes to the definition of "compensation" that section 415(c)(3)(D) specified, but it failed to include amounts which the employer contributed or deferred at the election of the employee and which are not includible in the gross income of the employee within the meaning of section 457. The 2001 plan document failed to address the changes that section 415(c)(3)(D) specified. Petitioner did not make amendments addressing the section 415(c)(3)(D) changes by September 30, 2002, or any other retroactive amendments as Rev. Rul. 82-66, supra, provides.

Even though the 1994 plan amendments and the 2001 plan document define "participant's compensation" as "within the meaning of Section 415(c)(3) of the Code", that definition is insufficient to apprise plan participants of the terms and

[*24] conditions of the plan. Cf. Churchill, Ltd. Emp. Stock Ownership Plan & Trust v. Commissioner, at *12 (finding that a plan's bare reference to the minimum distribution requirements of section 1.401(a)(9)-(5), Income Tax Regs., would be insufficient to apprise plan participants of the terms and conditions of the plan). Congress established the writing requirement so that employees, by examining the plan document, can determine exactly what their rights and obligations are under the plan. See Curtiss-Wright Corp. v. Schoonejongen, 514 U.S. 73, 83 (1995); H.R. Conf. Rept. No. 93-1280, at 297 (1974), 1974-3 C.B. 415, 458. A generic statement in a plan document that indicates that it complies with the Internal Revenue Code or even a specific section thereof does not adequately meet the congressional mandate. Churchill, Ltd. Emp. Stock Ownership Plan & Trust v. Commissioner, at *12.

Accordingly, petitioner has not shown that respondent's reliance on this part of the determination as part of the basis for revocation was unreasonable or arbitrary. See id. at *15.

C.    CRA Statutory Change That Affected the Plan

The Community Renewal Tax Relief Act of 2000 (CRA), appendix G of the Consolidated Appropriations Act, 2001, Pub. L. No. 106-554, 114 Stat. at 2763A-587 (2000), as pertinent to this case, also amended section 415(c)(3)(D).

[*25] CRA sec. 314(e)(1), 114 Stat. at 2763A-643, amended section 415(c)(3)(D) to require that "compensation" include any amount an employer contributed or deferred at the election of the employee and which is not includible in the gross income of the employee by reason of section 125, 132(f)(4), or 457. The addition of section 132(f) to the definition of participant's compensation in section 415(c)(3)(D) was effective for taxable years beginning after December 31, 1997. CRA sec. 314(g), 114 Stat. at 2763A-643 ("The amendments made by this section shall take effect as if included in the provisions of the Taxpayer Relief Act of 1997 to which they relate."); Taxpayer Relief Act of 1997 (TRA 97), Pub. L. No. 105-34, sec. 1072(b), 111 Stat. at 948 (stating that the provision relating to CRA sec. 314(e)(1) is effective for taxable years beginning after December 31, 1997).

As discussed above, neither the 1994 plan amendments nor the 2001 plan document addressed the changes CRA sec. 314(e)(1) made or otherwise referred to section 132(f)(4). Rev. Proc. 2002-73, sec. 5.01, 2002-2 C.B. 932, 934, extended the time for amending a plan to comply with the CRA to the latest of the end of the first plan year beginning on or after January 1, 2002, the end of the plan's GUST remedial amendment period, or June 30, 2003. There is no indication in the record that petitioner made amendments addressing the section 415(c)(3)(D) changes by September 30, 2003 (the end of the first plan year

**[*26]** beginning on or after January 1, 2002), or any other retroactive amendments as Rev. Rul. 82-66, supra, provides.

Accordingly, petitioner has not shown that respondent's reliance on this part of the determination as part of the basis for revocation was unreasonable or arbitrary. See Churchill, Ltd. Emp. Stock Ownership Plan & Trust v. Commissioner, at *15-*16.

D.    RRA Statutory Change That Affected the Plan

The Internal Revenue Service Restructuring and Reform Act of 1998 (RRA), Pub. L. No. 105-206, 112 Stat. 685, as pertinent to this case, added section 402(c)(4)(C).

Section 402(c) provides general rules applicable to rollovers from exempt trusts. Section 402(c)(4) defines the term "eligible rollover distribution". RRA sec. 6005(c)(2)(A), 112 Stat. at 800, amended section 402(c)(4) to exclude from an eligible rollover distribution any distribution which is made upon hardship of the employee. Section 402(c)(4)(C) applies to distributions made after December 31, 1998. RRA sec. 6005(c)(2)(C), 112 Stat. at 800.

The 1994 plan amendments do not exclude hardship withdrawals from the definition of an eligible rollover distribution. The 2001 plan document excludes

**[*27]** hardship withdrawals, but the 2001 plan document was effective October 1, 2001, and not December 31, 1998, as specified in RRA sec. 6005(c)(2)(C).

Accordingly, petitioner has not shown that respondent's reliance on this part of the determination as part of the basis for revocation was unreasonable or arbitrary.

II.    Whether Petitioner Failed To Use an Independent/Qualified Appraiser To Perform Valuations of the Securities the Trust Held

Section 401(a)(28)(C) provides that in the case of an ESOP an "independent appraiser" must perform all valuations of securities that are not readily tradable on an established securities market and that the standards for appraisers are similar to those set forth in the regulations promulgated under section 170(a)(1). Without going into all of the standards that are set forth in the statutes and the regulations, we focus on the specific aspects that respondent relied on to determine that the appraiser was not independent and on petitioner's response to those aspects.

Respondent contends that Mr. Henss, the person petitioner chose to appraise the value of K.H. Co. for plan years ending September 30, 2000 through 2003, failed to list or disclose his qualifications as specified in section 1.170A-13(c)(3)(ii)(F) and (5)(i)(B), Income Tax Regs. Respondent also contends that the appraisal summaries do not contain a declaration that Mr. Henss holds himself out

[*28] to the public as an appraiser or performs appraisals on a regular basis as specified in section 1.170A-13(c)(5)(i)(A), Income Tax Regs.

Although the appraisal summaries state that "[t]he undersigned holds himself out to be an appraiser", there is no signature below that statement on any of the appraisal summaries. Mr. Henss did not sign or date the appraisals. Mr. Henss also did not set forth his background, experience, education, and membership, if any, in professional appraisal associations as specified in the above-cited regulations. The only statement set forth in the appraisals or appraisal summaries regarding Mr. Henss' background or qualifications is: "The undersigned is an accountant who is familiar with the assets being appraised."

Petitioner claims that Mr. Henss has degrees in English, accounting, and law. Petitioner further claims that Mr. Henss "has been preparing appraisals of stock for employee stock ownership plans for many clients for several years" and that he is the author of a book on ESOPs. Petitioner also contends that Mr. Henss was in all other respects a person who was "independent" as set forth in the statute, the regulations, and the Commissioner's announcements on the subject.

Section 1.170A-13(c)(5)(i)(A), Income Tax Regs., provides that a qualified appraiser is an individual who includes on the appraisal summary a declaration that he or she holds himself or herself out to the public as an appraiser or performs

[*29] appraisals regularly.  Because there is no signature below the statement on the appraisal summaries that the "undersigned holds himself out to be an appraiser", the plan failed to meet this requirement.  See Churchill, Ltd. Emp. Stock Ownership Plan & Trust v. Commissioner, at *22 (finding that the appraiser, who failed to sign the appraisal summaries, failed to meet the requirements of section 1.70A-13(c)(5)(i)(A), Income Tax Regs.); Hollen v. Commissioner, slip op. at 10.

Additionally, there is nothing in the administrative record to corroborate any of petitioner's claims regarding Mr. Henss' educational background, his professional experience preparing other plan appraisals for other clients, or his book.  Rule 217 states:  "Disposition of an action for declaratory judgment * * * [such as the one here] will ordinarily be made on the basis of the administrative record * * *.  Only with the permission of the Court, upon good cause shown, will any party be permitted to introduce before the Court any evidence other than that presented before the Internal Revenue Service and contained in the administrative record".  Petitioner has failed to provide any additional evidence to corroborate these statements or show good cause for us to consider them.

Section 1.170A-13(c)(3)(ii)(F), Income Tax Regs., provides that the qualified appraiser who signs the appraisal must list his or her background,

[*30] experience, education, and membership, if any, in professional appraisal associations. Section 1.170A-13(c)(5)(i)(B), Income Tax Regs., provides that a qualified appraiser is an individual who includes on the appraisal summary a declaration that he or she is qualified to make appraisals because of his or her background, experience, education, and membership, if any, in professional appraisal associations.

Because Mr. Henss failed to sign the appraisals, and because neither the appraisals nor the appraisal summaries list the referenced information, the plan also failed to meet these requirements. See Churchill, Ltd. Emp. Stock Ownership Plan & Trust v. Commissioner, at *20-*22 (finding that the appraiser, who failed to sign the appraisal and failed to list his background, experience, education, and membership in the appraisal summary, failed to meet section 1.170A-13(c)(3)(ii)(F) and (5)(i)(B), Income Tax Regs.); Hollen v. Commissioner, slip op. at 10.

Petitioner claims that it substantially complied with section 1.170A-13, Income Tax Regs. In particular, petitioner contends that Mr. Henss was not a party in donor transactions in the property being appraised, a donee of the property, or an employee of the donors or donees and that he performs most of his appraisals for entities other than petitioner. In certain circumstances a taxpayer

**[*31]** may be deemed to satisfy a statute if the taxpayer "substantially complies" with its requirements.  See Bond v. Commissioner, 100 T.C. 32 (1993).  The doctrine of substantial compliance applies only when the requirement is procedural or directory and does not relate to the essence of the statute.  Taylor v. Commissioner, 67 T.C. 1071, 1077-1078 (1977).

Section 401(a)(28)(C) provides that  an "independent appraiser" must perform any valuation of securities not readily tradable on an established securities market and that the standards for appraisers are similar to those set forth in the regulations promulgated under section 170(a)(1).  Thus, the essence of the statute involved here is that the appraiser must be independent, which does not inherently subsume the requirement that the appraiser be qualified.  The qualifications required of an appraiser are in the section 170 regulations and appear to be more procedural and directory.  See Bond v. Commissioner, 100 T.C. at 41; see also Churchill, Ltd. Emp. Stock Ownership Plan & Trust v. Commissioner, at *24.

We are not able to find on the administrative record that Mr. Henss was an independent or qualified appraiser for purposes of section 401(a)(28)(C).  There is no indication that petitioner substantially complied with section 1.170A-13, Income Tax Regs.  Accordingly, petitioner has not shown that respondent's

[*32] reliance on this part of the determination as part of the basis for revocation was unreasonable or arbitrary.

III.    Whether Petitioner Failed To Follow Its Own Terms

Respondent contends that the plan failed to invest primarily in K.H. Co.'s securities and therefore failed to follow its own terms. Petitioner intended to be an ESOP. The 1994 plan document and its amendments and the 2001 plan document are all titled "K.H. Company, L.L.C. Employee Stock Ownership Plan", and they all state: "This Plan is intended to be an Employee Stock Ownership Plan as defined in Internal Revenue Code, Section 4975(e)".

A.    Petitioner Was Not an ESOP

Section 4975(e)(7)(A) defines an ESOP as "a defined contribution plan * * * which is a stock bonus plan which is qualified, or a stock bonus and a money purchase plan both of which are qualified under section 401(a) and which are designed to invest primarily in qualifying employer securities". Section 4975(e)(8) defines the term "qualifying employer security" as an employer security within the meaning of section 409(l). Section 409(l) provides, in pertinent part, as follows:

**[*33]** SEC. 409(l).  Employer Securities Defined.--For purposes of this section--

(1) In general.--The term "employer securities" means common stock issued by the employer * * * which is readily tradable on an established securities market.

(2) Special rule where there is no readily tradable common stock.--If there is no common stock which meets the requirements of paragraph (1), the term "employer securities" means common stock issued by the employer * * * having a combination of voting power and dividend rights equal to or in excess of--

(A) that class of common stock of the employer * * * having the greatest voting power, and

(B) that class of common stock of the employer * * * having the greatest dividend rights.

(3) Preferred stock may be issued in certain cases.-- Noncallable preferred stock shall be treated as employer securities if such stock is convertible at any time into stock which meets the requirements of paragraph (1) or (2) (whichever is applicable) and if such conversion is at a conversion price which * * * is reasonable. * * *

Section 409(l) thus defines "employer securities" narrowly as common stock or preferred stock that meets certain requirements.  Therefore, employer securities for the purposes of section 4975(e)(7) must be, at the very least, stock the employer issued.

[*34] Section 7701(a)(7) provides that the term "stock" includes shares in an association, joint-stock company, or insurance company. Section 7701(a)(3) provides that the term "corporation" includes associations, joint-stock companies, and insurance companies. Section 7701(a)(2) provides that the term "partnership" includes a syndicate, group, pool joint venture, or other unincorporated organization through or by means of which any business, financial operation, or venture is carried on and which is not a trust or estate or a corporation. Thus, the term "stock" generally excludes partnership interests.

Respondent contends that because K.H. Co. was a partnership for tax purposes, it did not have qualifying employer securities. The parties do not dispute that K.H. Co. was a partnership at all relevant times.[7] Indeed, K.H. Co.

---

[7]Petitioner nonetheless contends that "a limited liability company with two members is an association". Petitioner further contends that "it must be concluded that a limited liability company may adopt and utilize an ESOP". Petitioner's first contention is overly broad. Not all LLCs with two members are associations. Under the so-called check-the-box regulations, an LLC with at least two members may elect to be classified as an association or a partnership. See sec. 301.7701-3(a), Proced. & Admin. Regs.; see also secs. 301.7701-2(b), 301.7701-3(b), Proced. & Admin. Regs. Even before the check-the-box regulations, the so-called Kintner Regulations provided that LLCs could be classified as partnerships rather than corporations for Federal tax purposes. See Pierre v. Commissioner, 133 T.C. 24, 30 n.10 (2009).
    K.H. Co. was classified as a partnership at all relevant times, both before and after the check-the-box regulations. Therefore, petitioner's second contention is not before us.

[*35] admits that it filed Forms 1065, U.S. Return of Partnership Income, for tax years ended September 30, 1995 through 2004. Because K.H. Co. was a partnership for tax purposes and did not have any stock, it did not have any qualifying employer securities for purposes of sections 409(l) and 4975(e)(7) and (8) in which the plan could invest. Therefore, petitioner failed to operate as an ESOP pursuant to its terms when K.H. Co. became its employer, sponsor, and administrator.

B.     Petitioner Failed To Follow Its Own Terms

A qualified employee benefit plan is a written program and arrangement. See sec. 1.401-1(a)(2), Income Tax Regs.; see also Employee Retirement Income Security Act of 1974, Pub. L. No. 93-406, sec. 402(a)(1), 88 Stat. at 875 ("Every employee benefit plan shall be established and maintained pursuant to a written instrument."). As discussed above, Congress established the writing requirement so that every employee, on examining the plan document, may determine exactly what his or her rights and obligations are under the plan and who is responsible for operating the plan. See Curtiss-Wright Corp., 514 U.S. at 83; H.R. Conf. Rept. No. 93-1280, supra at 297, 1974-3 C.B. at 458. A plan may be disqualified for failing to operate in accordance with its terms. See, e.g., Hull v. IRS, 656 F.3d 1174, 1184 (10th Cir. 2011); cf. sec. 1.409(p)-1(b)(2)(iv)(B), Income Tax Regs.

**[*36]** ("[A] plan that does not operate in accordance with its terms to reflect section 409(p) fails to satisfy the qualification requirements of section 401(a)".).

The 1994 plan document and its amendments and the 2001 plan document state that the plan is intended to be an ESOP as section 4975(e) defines the term. They also state that "the assets of the Plan shall be invested primarily in Qualified Employer Securities". Because petitioner failed to invest primarily in employer securities, it failed to follow its own terms.

Petitioner has not shown that respondent's reliance on this part of the determination as part of the basis for revocation was unreasonable or arbitrary.

IV.    Conclusion

We conclude that there was no abuse of discretion in respondent's determination that the plan was not qualified under section 401(a) for its 1994 year and subsequent plan years and that the trust was not exempt under section 501(a).

Any contentions we have not addressed are irrelevant, moot, or meritless.

To reflect the foregoing,

Decision will be entered for

respondent.